N6RKMORS

1    UNITED STATES DISTRICT COURT
     SOUTHERN DISTRICT OF NEW YORK
2    ------------------------------x

3    UNITED STATES OF AMERICA,

4              v.                          15 CR 379 (PKC)

5    OTTO RENE SALGUERO-MORALES,
     RONALD ENRIQUE
6    SALGUERO-PORTILLO,

7                                          Sentence
                   Defendants.
8    ------------------------------x

9                                          New York, N.Y.
10                                         June 27, 2023
                                           2:15 p.m.
11

12   Before:

13                     HON. P. KEVIN CASTEL,

14                                         District Judge

15                         APPEARANCES

16   DAMIAN WILLIAMS
          United States Attorney for the
17        Southern District of New York
     KYLE A. WIRSHBA
18        Assistant United States Attorney

19   DAVID ZAPP
          Attorney for Defendant Salguero-Portillo
20
     ROBERT A. FEITEL
21        Attorney for Defendant Salguero-Morales

22   Also Present:

23   Samantha Vila, Spanish Interpreter
     Jill Hoskins, Interpreter (Spanish)
24

25

N6RKMORS

1          (Case called)

2          MR. WIRSHBA:  Good afternoon, your Honor.  Kyle

3    Wirshba, for the government.

4          THE COURT:  Good afternoon, Mr. Wirshba.

5          And for Otto Salguero?

6          MR. FEITEL:  Good afternoon, your Honor.  Robert

7    Feitel, for the defendant, Otto Salguero-Morales.  My client is

8    present in court today.

9          THE COURT:  Thank you, Mr. Feitel.

10          And for Ronald Salguero-Portillo?

11          MR. ZAPP:  David Zapp, your Honor.  And good afternoon

12    to you.

13          THE COURT:  Good afternoon.

14          The first order of business will be whether I have

15    everything I should have.

16          I have a presentence report, recommendation, and

17    addendum as to Ronald Enrique Salguero-Portillo that was

18    revised by probation on March 3, 2023.  I have a letter from

19    Mr. Zapp, dated March 6, 2023.  I have a letter from Mr. Zapp,

20    dated June 13, 2023.  And I have a letter from Mr. Zapp, dated

21    June 14, 2023.

22          As to Otto Rene Salguero-Morales, I have a letter from

23    Mr. Feitel, dated June 20, and I also have a memorandum from

24    Mr. Feitel that is also dated June 20, 2023.

25          I have a letter from the government, dated June 20,

N6RKMORS

1    2023.

2              Do I have everything on the subject of sentencing,

3    Mr. Zapp?

4              MR. ZAPP:  Yes, your Honor.

5              THE COURT:  Mr. Feitel?

6              MR. FEITEL:  Your Honor, I received the initial

7    version of the presentence report in this case, and I had

8    submitted comments to probation, which were mostly factual

9    matters, and the final version of the presentence report

10   incorporated those changes.  I think that's the only matter

11   left for my client, Mr. Salguero.

12             THE COURT:  But that would not be anything that would

13   come to me.  I wouldn't see your letter, I wouldn't see the

14   preliminary version.  So the question is whether I have what I

15   should have for the purposes of sentencing?

16             MR. FEITEL:  Yes, your Honor.

17             THE COURT:  Same question for the government?

18             MR. WIRSHBA:  Yes, your Honor.

19             THE COURT:  All right.

20             Mr. Zapp, has your client read, reviewed, and

21   discussed with you the presentence report, recommendation, and

22   addendum?

23             MR. ZAPP:  Yes, your Honor.

24             THE COURT:  Does he have any objections to the facts

25   set forth in the PSR?

N6RKMORS

| | |
|---|---|
| 1 | MR. ZAPP:  We filed certain objections, and that was |
| 2 | it. |
| 3 | THE COURT:  With whom? |
| 4 | MR. ZAPP:  With the probation office. |
| 5 | THE COURT:  Okay.  And what happened? |
| 6 | MR. ZAPP:  They went to the government, asked if I was |
| 7 | representing -- what I was representing, was it valid, and, |
| 8 | depending on what the government told the probation office, |
| 9 | that's what they accepted. |
| 10 | THE COURT:  Okay.  I just had a discussion with |
| 11 | Mr. Feitel on this. |
| 12 | It goes like this, Mr. Zapp:  I don't see the draft |
| 13 | presentence report, I don't see your objections, I don't see |
| 14 | the comments by the government.  I receive the document that I |
| 15 | described to you, that's revised on March 3rd, 2023. |
| 16 | I have no idea what went on before that.  My question |
| 17 | is:  Does the defendant have any objections to the facts set |
| 18 | forth in the presentence report revised on March 3rd, 2023? |
| 19 | MR. ZAPP:  No. |
| 20 | (Counsel confer) |
| 21 | MR. ZAPP:  Apparently, my objections are in the copy |
| 22 | that you have.  So then I have -- |
| 23 | THE COURT:  Well, have you seen the presentence |
| 24 | report? |
| 25 | MR. ZAPP:  Have I seen it? |

1          THE COURT:  Yes.

2          MR. ZAPP:  Yes, I've seen it.

3          THE COURT:  The question was, before I think I asked:

4     Has your client received, reviewed, and discussed with you the

5     presentence report, recommendation, and addendum, and I thought

6     you said yes.

7          MR. ZAPP:  Yes, we did discuss it.

8          THE COURT:  Okay.

9          And that's the report revised on March 3, 2023?

10         MR. ZAPP:  Yes.

11         THE COURT:  Do you or your client have any objections

12    to the facts set forth in that report?

13         MR. ZAPP:  No, your Honor.

14         THE COURT:  Do you have any objections to the

15    guideline calculation set forth in the presentence report?

16         MR. ZAPP:  I just want to be clear on that.  I did

17    sign that agreement, and in that agreement, there was no

18    objection to the guideline.  It doesn't mean I have to like it,

19    but I did sign it, and I am bound by it.

20         THE COURT:  I'm asking you a question.  I have a

21    presentence report that was revised by probation on March 3rd,

22    2023.  It has a guideline calculation in it.  It's found on,

23    among other places, page 25 of the PSR.

24         My question is:  Do you have any objection to that

25    guideline calculation?

N6RKMORS

1          MR. ZAPP:  No, your Honor.

2          THE COURT:  All right.

3          Mr. Feitel, has your client read, reviewed, and

4    discussed the presentence report, revised on March 10, 2023?

5          MR. FEITEL:  Yes, your Honor.

6          THE COURT:  Does the defendant have any objections to

7    the facts set forth in the presentence report?

8          MR. FEITEL:  No, your Honor.

9          THE COURT:  Does the defendant have any objections to

10   the guideline calculations set forth in the presentence report?

11         MR. FEITEL:  No, sir.

12         THE COURT:  All right.

13         Does the government have any objections to the facts

14   set forth in Ronald Salguero's presentence report or Otto

15   Salguero's presentence report?

16         MR. WIRSHBA:  No, your Honor.

17         THE COURT:  Does the government have any objection to

18   the guideline calculations in either of those two reports?

19         MR. WIRSHBA:  No, your Honor.

20         THE COURT:  Okay.

21         I adopt as my findings of fact the facts set forth in

22   the Ronald Salguero presentence report, and I find the

23   guidelines are correctly calculated at total offense level 37,

24   Criminal History Category I.  The statutory term on Count One

25   is ten years to life, the statutory term on Count Three is up

N6RKMORS

```
 1    to life imprisonment, and the guideline range is 210 to

 2    262 months.

 3              As to Otto Salguero:  I adopt as my findings of fact

 4    the facts set forth in the presentence report.  It happens that

 5    his total offense level is also 37, Criminal History

 6    Category I.  The statutory ranges and the guideline ranges are

 7    the same as I just described for Ronald Salguero.

 8              I'll now give the parties an opportunity to speak.  I

 9    want to first ask Mr. Feitel a question or two.

10              Did you see Mr. Zapp's letters of June 13 and June 14?

11              MR. FEITEL:  I did, your Honor.

12              THE COURT:  Okay.

13              And thereafter, and after the government put in its

14    sentencing submission, you put in a sentencing submission to me

15    dated June 20th.  Is that correct?

16              MR. FEITEL:  Yes, sir.

17              THE COURT:  Why is your sentencing submission not a

18    breach of your plea agreement with the government, just as

19    Mr. Zapp conceded in his letter of June 14?

20              MR. FEITEL:  I am not asking your Honor to downwardly

21    depart in this case.  I'm asking for a variance, which is a

22    part of 3553(e) and is not, I do not believe, a violation of

23    the plea agreement between my client and the United States.

24              THE COURT:  Okay.  So let me just understand here —

25    you are not asking for a minor role in the offense adjustment
```

N6RKMORS

```
 1   under the guidelines?
 2               MR. FEITEL:  No, sir.
 3               THE COURT:  Because I misread your memo.
 4               Well, I'm reading, in page 6, your argument on minor
 5   role:  This decreases his offense level by two levels.
 6               Why isn't that a departure?
 7               MR. FEITEL:  Your Honor --
 8               THE COURT:  This would result in an adjusted guideline
 9   level of 31, which is equal to 108 to 135 months.
10               MR. FEITEL:  I take your Honor's point.  The sentence
11   that follows says that, by analogy, the defendant believes that
12   this calculation would be relevant to the Court's consideration
13   of the requested downward variance.
14               I used the departure as a point of reference for the
15   request for the variance.  I did not mean to suggest in any way
16   that I was asking this Court for a downward departure, and I
17   apologize if this particular phraseology was less than clear.
18               THE COURT:  All right.
19               Let me invite each set of counsel -- first I think
20   I'll do Otto Salguero.  And one of the questions that is not
21   entirely clear from the materials before me is, I think,
22   Mr. Feitel, you said that you negotiated with the federal
23   government for your client's surrender in Miami, if I
24   understood that correctly.  I wanted to find out, because I
25   think it may be relevant to sentencing, why did you so
```

negotiate with the government, and why did your client

surrender to federal authorities in Miami?

MR. FEITEL:  With respect to the first inquiry, your

Honor, my client learned that there had been an indictment

returned against him.  It was a matter of public knowledge; it

wasn't returned under seal.

At that time, Mr. Ronald Salguero and Otto Salguero

contacted me through the auspices of a Guatemala lawyer, and I

met with them, and I discussed the case.  They advised me that

they did not wish to be arrested in Guatemala, they did not

wish to be incarcerated in Guatemala, they wanted to come to

the United States as quickly as they could, and they wanted to

try to, in other words, resolve this situation.

Not to digress, but your Honor may recall that during

the trial of Tony Hernandez, there was testimony about the

murder of a Honduran national named Magdaleno Funez or Nery

Sanabria — he had aliases — who was killed in a Honduran jail

while awaiting extradition.  He was also one of my now former

clients.  And I believe that that murder and the attendant

publicity also was a motivating factor.  Your Honor is shaking.

It's obvious the reason why.

As to why my client surrendered in Miami, that was a

matter solely of available flights.  They would have preferred

to have come to this jurisdiction.  We waived venue in

connection with their coming to Miami.  But at the time of year

1    that the flights were scheduled, I think the only place they

2    could go was to Miami.  And then your Honor may recall that was

3    right around COVID.  I don't recall if there were limited

4    flights, but it was in that moment.

5         And so the government allowed my clients to come.

6    They were both my clients at the time, for convenience.

7         THE COURT:  I remember that.

8         MR. FEITEL:  They arranged for them to be granted

9    special parole entry visas for the limited purpose of

10   surrender, and, with that, they both came to the United States

11   voluntarily, that is, not in custody, although, as I mentioned,

12   they knew what was going to happen because I told them to a

13   certainty what was going to happen.

14        THE COURT:  Okay.  Thank you.  That's very helpful.

15        But this is your opportunity to speak on behalf of

16   your client, and then I'm going to give your client an

17   opportunity to speak, and do the same with your codefendant.

18        MR. FEITEL:  Thank you, your Honor.

19        I want to start by mentioning that there are members

20   of both the Salgueros' family in the courtroom today.  My

21   client's sisters and some nieces and other family members are

22   here for support.  They live in the United States.  And that's

23   going to figure into the request I make at the end for

24   designation.

25        Your Honor, I'm asking your Honor -- I should say that

1   we are in agreement about the guidelines.  This was a plea

2   offer that was negotiated, accepted, and is enforceable.  There

3   is no argument here that it's not what my client entered into,

4   and we are in agreement with the government about the guideline

5   range.

6           My request is that your Honor consider the factors in

7   the sentencing statute and give my client a variance downward

8   to the mandatory minimum in this case.  I hope that much was

9   clear from my memorandum.

10          The principal reason for my asking it is that I think

11  that my client's role in this offense relative to everyone else

12  was, in the vernacular, minor.  My client was, for all intents

13  and purposes, an intermediary between other drug traffickers.

14  He was helping to transport cocaine from the border between

15  Guatemala and Honduras to the farm where he lived, and then it

16  was moved onward.

17          He is both the beneficiary and the victim of that

18  geography.  He was paid a commission.  I don't believe that

19  there's any evidence, and I don't think the government has

20  argued, that my client invested or that he controlled the

21  routes.  And although the government notes in its pleading that

22  my client played an essential role, I think a fair response is,

23  he did not play a role that requires some special technical

24  skill or knowledge.  He drove the trucks, and they hid the

25  cocaine on the farm.

N6RKMORS

```
1            He wasn't, in that sense, a pilot or someone who was a
2    chemist or someone who brought to bear some particularly unique
3    set of skills; he simply was a person with a farm in the right
4    location who drove a truck.
5            And to the extent that my client's service was a link
6    in the chain, I don't think it could really be principally
7    argued that there wouldn't have been someone else who would
8    have done what he did.  That's not to excuse what he did.  This
9    is not an excuse; it's for context.  There does not seem to be
10   anywhere in Central and South America, from what I can
11   determine — and I'm sure your Honor has seen it in your cases —
12   any reluctance on people to become involved in these matters.
13   When one person is arrested, someone else in the drug
14   organization hierarchy takes their place.
15           But my client's role was really sort of a mule with a
16   truck and a piece of land.  And so, in that sense, I'd ask your
17   Honor to give him some consideration, because he was not a
18   leader.
19           The other defendants in this line of cases occupy a
20   completely different position, both in Guatemala and in
21   Honduran society, and in the actions that they took.  I have
22   read the transcripts of the trial of Tony Hernandez, I've read
23   the sentencing memorandum of the other defendants that were
24   convicted before your Honor, I've actually even read the
25   government's 404(b) motion in the upcoming trial.  Those
```

N6RKMORS

1    documents are replete with violence, and I don't mean ordinary

2    violence associated with drug trafficking; we're talking about

3    violence in its most primal sense that seemed, as I put in my

4    memo, kind of unrelenting.  There's no allegation that my

5    client was involved in any of those things.

6        In fact, what the government says about the weapons is

7    that the weapons were provided by other members of the

8    conspiracy to protect their merchandise.  That's actually, I

9    think, paraphrasing what the government said.

10        Also, to the extent that the government notes — and I

11    think correctly — that large quantities of drugs were moved,

12    that's another matter that was outside my client's control.  If

13    there was five kilos, that's what they moved; if there was

14    5,000, that's what they moved.  And I think, in context, it

15    reflects both the sort of never-ending avarice of the other

16    defendants in this case that my client was the person who did

17    what they told him to do.  He didn't schedule the loads.

18        So with respect to that aspect of the case, I'd ask

19    your Honor to consider giving him a downward variance because

20    his role was, in the larger scheme of things, relatively

21    smaller than the others.

22        I noted some other factors for your Honor's

23    consideration.  I just want to briefly go over them.  One was

24    the one we discussed today, which is my client came here

25    voluntarily.  And your Honor knows, in the line of cases where

N6RKMORS

<blockquote>

1    my client is charged, there's still absent fugitives.  There's

2    a defendant named Mario Calix.  He's been out since time began.

3    I don't remember which superseding indictment he is.  My client

4    did not — and the same for Ronald Salguero, even though I don't

5    represent him today — neither of them considered hiding or

6    running or going to ground in the vernacular or going someplace

7    else.  Guatemala is a rural country.  It is possible to hide.

8    They came here, they came here right before COVID.  COVID was

9    in the news.  I discussed with the government these matters, I

10   discussed with my clients.  And, at the end of the day, their

11   choices were come now or possibly never be able to come.  So

12   they did.  I was in this courthouse for their initial

13   appearance.  They went with the marshals after they were held

14   without bond by consent, and they were sent to the MDC.  And I

15   think it was the next day that the facility closed.

16         I recognize, and so does my client, jails are not

17   hotels.  No one could say otherwise.  They're not designed to

18   be.  But the conditions of confinement during the pandemic, I

19   think, were exponentially harsher than people would have been

20   able to foresee.  And I think there was also an unpreparedness

21   on the part of society in general and on the Bureau of Prisons,

22   in particular, and in jails all over this country.  I cite to

23   some matters in my pleading, but I don't think it really is

24   beyond the ken of an ordinary person to understand that when

25   the government told us, in the person of Fauci, who everyone

</blockquote>

1    seems to be upset with, that we should all socially distance,

2    most people were able to or tried to, to the extent they could.

3    Inmates incarcerated were left to basically suffer at the hands

4    of the jailers and of the conditions of confinement, which

5    generally are not very large — people are tucked into cells —

6    and there was, in my client's mind, a gigantic fear of

7    contracting COVID.  He's not a young man, and I think that

8    there are cases from the neighboring jurisdiction, the Eastern

9    District of New York, that I cited about giving some credit for

10   it.  And I think your Honor may also recall that when the FIRST

11   STEP Act passed, and there was talk of giving sentence

12   reductions to people and letting people out of jail, the

13   factors of age and COVID factored into that and were considered

14   by courts here and in other jurisdictions.  And, in the same

15   way, I think it would be relevant, since my client has come

16   through to the other side of the pandemic, to at least

17   acknowledge that there should be some benefit for it, because

18   it was not of his own design, and he was basically -- he

19   suffered at the hands of others, and not with bad intentions,

20   but just because of the rapidity and the sort of unexpected

21   nature of the pandemic.

22           In that regard, your Honor, my client also is 61 or 2.

23   If your Honor imposes the ten years that I asked for, that is

24   an extraordinarily long period of time for someone with his

25   age.  It is -- and it's a hard argument to make in front of

1   your Honor, and I have trouble with it because I'm actually

2   older than my client, but the reality is I know that the next

3   ten years of my life are really probably the -- I hope I

4   survive.  That's my bottom line.  There's a chance my client

5   might not make it to 70.  And if he does, he will be a changed

6   person.

7          There is a distinction.  I'm going to be 65 this

8   summer, perhaps your Honor will be 65 soon, and I think that

9   there is a difference between that and being in your seventies.

10   I do think that to the extent that age correlates with

11   recidivism, given my client's surrender, given the publicity

12   surrounding these cases, the chances of him becoming a

13   recidivist are statistically less than zero.  No one could

14   guarantee it — that would be a crazy thing to say — but under

15   the circumstances of this case, I don't really see how my

16   client is going to go back to drug trafficking.  I think it

17   more likely, as I explained in my memo, that he will return to

18   his life to basically eke out the days that remain to him with

19   his family and friends in solitude.

20          I think he is also going to be their -- there's always

21   some risk in the future, that even when you plead, someone is

22   going to take it as a grievous insult to their drug-trafficking

23   business.  I didn't argue about danger because there's nothing

24   specific to hang it on, but it is always in my mind that anyone

25   who comes here and returns faces problems.

N6RKMORS

1          And your Honor knows my client did meet with the
2    government; the parties both acknowledge that.  He's,
3    unfortunately, not in a position to be able to cooperate, which
4    would have helped his situation, but he is not able to.  And
5    because of the weapons belonging to others, he loses the safety
6    valve, and there's also an amendment pending of the federal
7    sentencing guidelines that becomes effective in November, which
8    provides for an additional reduction in sentence if someone has
9    no criminal history points.  For zero criminal history points,
10   there's going to be a two-level reduction.  My client would not
11   be amenable to that because of the gun in this case.

12          So the gun causes him two points up and takes away
13   four points down, the safety valve, and then it takes away the
14   sentencing change that's coming in November.

15          The only other thing that I wanted to say to your
16   Honor about my client, just to make sure I got everything, at
17   the end, my client came here, he knew what he was facing, he
18   knew what was going to happen to him, and he did it anyway.  To
19   be fair, not that it's relevant here completely, I've had
20   clients who said they were going to come and still are nowhere
21   to be seen.  So, I think Mr. Salguero and his codefendant,
22   Ronald Salguero, made the decision, they carried through with
23   it.  Unlike the overwhelming majority of codefendants in this
24   line of cases, they pled guilty.  They admitted their guilt.
25   They did not have a trial.  Your Honor has presided, I think,

at least over two trials, and there's one more coming with

three more defendants.  My client stands apart.  He

acknowledged guilt, and he acknowledged responsibility.  He's

done all that he can to try to ameliorate what happened to him.

He also — and I don't think this is disputed — stopped

working in drug trafficking back in 2011 or 2012, and I

discussed the massacre at his farm perpetrated by a criminal

organization called the Zetas in Mexico.  I think Mr. Zapp also

references it.

My client had been slowing down working, but if there

was ever an event that would lead a rational person to stop

being a drug trafficker, it was the massacre.  The Zetas

decapitated some 20 odd or more people.  They kidnapped and

killed my client's niece and two of his nephews.

And I understand that violence comes with the terrain,

and so does my client.  It would be impossible to think

otherwise or to principally argue otherwise, but the kind of

violence that was perpetrated in this case, I think, stands

apart in terms of its brutal nature and in terms of the number

of victims in the case, and my client did stop participating.

It's not a defense in this case.  The law in this circuit is

much more complicated about withdrawal from a conspiracy.  It

requires not only a cessation of activities or requires the

person to take some affirmative step to thwart the goal of the

conspiracy, for which I will never understand what my client

N6RKMORS

could have done, but perhaps he could have, but he did not.
So, he did not have that defense available to him.  And in the
end of the day, he accepted responsibility for what he had
done.

I hope your Honor will be able to show some measure of
mercy for him because the primary goal of criminal justice in
this country cannot only be punishment.  My client is going to
be punished, even at the mandatory minimum, beyond what can be
imagined.  When I think of the time, I always try to think of
the difference between my children at birth and them at
ten years old or between ten and twenty.  It is a long period
of time.  And Mr. Salguero is in good health, thank God, but he
is not a young man.

With that, I'd be glad to answer any questions your
Honor might have, but I'll tell your Honor that I asked my
client -- I told my client, less is more when you speak to the
judge.  It's advice I have.  Not everyone takes it.  But the
only other thing I would ask the Court is if you could
designate my client, or at least recommend the designation —
because I know that despite being an Article III judge, your
Honor doesn't have power over the Bureau of Prisons — if you
would designate him to Fort Dix, please, which is FCI in New
Jersey.

THE COURT:  Thank you.

MR. FEITEL:  Thank you.

N6RKMORS

1          Mr. Otto Salguero, this is your opportunity to speak

2     to address the Court directly to bring to my attention any

3     facts or circumstances that you believe I should take account

4     of today.  If there's anything you wish to say, this is the

5     time to say it.  And you may remain seated.

6          And, Mr. Feitel, if you could just move your

7     microphone closer to your client there.  Just move it over.

8          Yes, that's good.

9          DEFENDANT SALGUERO-MORALES:  Thank you, your Honor.

10         First, I would like to ask God for forgiveness, the

11    government of the United States, and you, your Honor, for the

12    wrongdoing I committed.

13         I would like you to consider my age, and I would like

14    to go back to my family and my children, your Honor.

15         I would like you to have mercy with me, your Honor.  I

16    don't really have the words to express myself.

17         Thank you.

18         THE COURT:  Thank you, sir.

19         Mr. Zapp, this is your opportunity to speak on behalf

20    of your client.

21         MR. ZAPP:  Thank you, your Honor.

22         First, let me say that it's not a matter of stealing

23    my thunder, because I welcome the fact that my cocounsel, or my

24    counsel, the other counsel, said all the things that he did,

25    and he said it very eloquently.  And I know this Court wants

N6RKMORS

```
1    people to cut to the chase, the little I know of you, your
2    Honor, so I will do that, and I will make sure not to tread.
3    As much as I like to perform, I am not going to perform.  I'm
4    going to rely on what my cocounsel said, because the fact is,
5    every single thing that he said can apply to my client.  I
6    would go a little more poetic, shall we say, because I think
7    that what drove my client, and I assume, to do a good deed for
8    my cocounsel's client, they could not live life as fugitives.
9            I noticed in the trial that you had with, I guess his
10   name is Tony, there was a moment there where the government
11   said that they wanted to play a stipulated conversation.  It
12   was a wiretapped conversation.  And it was a wiretapped
13   conversation between two men, and one of the men either wanted
14   the money or the drugs, and there was pressures from above.
15   And I remember what was said, and I thought it was very
16   significant because it was a better way of saying it than I
17   did.  What I'm talking about is that there was a point where
18   one of the men say to the other one:  What if I tell this man,
19   because he's pestering me and saying that he wants me to name a
20   day, and this way, you can think of your people, whether they
21   can solve this for you by a particular day.  And the other male
22   says:  Those hillbillies don't even work on Sundays.
23           Well, I would not have thought of the word hillbillies
24   because I would have thought of the word rube, I would have
25   thought of the word hick, I would have thought of the word
```

country bumpkin, and all of them, I think, are too pejorative,
and they don't merit that.  The fact is, they were born in the
jungle, and they live in the jungle, and they refer to
Guatemala City as the capital, and the difference is enormous.

So I think that what Mr. Feitel has said deals with
what they did and how little they did in this particular case.
And this conversation can tell you, your Honor, who you're
dealing with, who both of these people are.  These people are
hillbillies.  They are people that have nothing to do with what
is often described here as state-sponsored narcotics
trafficking.  The fact is that either one of these guys could
have been caught in Avenue C or Avenue B and brought here, and,
if I can speak out of turn, get ten years, and everybody would
go home believing that they had been dealt with correctly.
Some, especially in Manhattan, might have thought they could
get less, given all the circumstances, but, as my grandmother
would say, dayenu, we should have been satisfied at ten, and we
should be satisfied at ten.

I think it is a just sentence.  They may think
differently.  And I can tell you, I am saying this not trying
to sell a used car here, because if I came up here, and I said,
listen, they don't deserve more than five years, I'd be
intellectually dishonest.  That's not what I feel.  But I also
feel that 17 is beyond the pale, 15 is beyond the pale, and the
difference between 12 and 10 is, again, one of those

1    comparisons where at least the legislature, the statute, says,

2    if you are confronted with two equally reasonable —

3    reasonable — sentences, then you should take the short one

4    under the rule of lenity.  And this is what I'm thinking.

5              Mr. Feitel had mentioned something in his report that

6    was all the things that I thought about.  There were times when

7    I was with my client, and I would leave and say, I wish you

8    could have been in the room with me, because I can't express

9    just how bad I feel for this guy.  Because this guy — and I

10   think he will tell you in his own statement — he's a cowboy.

11   He has a day job.  I don't want this Court -- because of all

12   that has been written about, I don't want this Court to think

13   that his career choice is to be a transporter of narcotics.

14   This is not his choice.

15             He has a day job.  And if you were to say that in a

16   year, he spent 12 days of that year transporting or holding the

17   cocaine -- and, by the way, when we talk about holding the

18   cocaine, it's not storage for months or weeks; this is very

19   valuable property to the purchasers, and, generally speaking,

20   it was more of a clearinghouse.  That was exactly when the

21   Mexicans would come that same day or the day after, at most,

22   and they would pick up their product.  But my client has

23   nothing to do with the major people.

24             One of the things that I have to say about minor

25   role — and that's with a little M, not a big M — and that is

N6RKMORS

1    that I think the Commission, which are people who are experts

2    in sentencing, wanted to clarify was that a person who is much

3    less culpable than the people in that indictment — not the

4    regular people, but the people in that indictment — that person

5    should get minor role, with a capital M, but I'm not going

6    there, I'm going with a lower M and variance, because that's

7    really the problem that defense lawyers have.  Some of the very

8    considerations that you're asked to rule upon to determine

9    whether somebody has minor role are the same kind of

10   considerations that you would have when you deal with 5358,

11   3558 –- I forgot the number, but you know the number.

12       What I have here is kind of a roster of not only the

13   people that he was indicted with, but, as Jason Richman said,

14   Assistant Richman said, it was all a big conspiracy.  So I'm

15   not even just talking about the conspiracy that he was in,

16   where I want the record to reflect that he knew no one.  He

17   knows no one in his own indictment.  The only person he knows

18   is Ardon.  That's what I mean.  I'm just saying that you're

19   really dealing with a person that got involved in drugs,

20   period.  He's not a career person in this.

21       When he was joined with those people, he knows none of

22   the people, and Ardon, as irony would have it, is in a

23   separate, altogether separate, indictment, which I don't

24   understand why he wasn't put with that person.  If there was

25   ever a relationship, it's between boss and worker, or capo and

N6RKMORS

1    worker.  He worked for Ardon.

2            Because what really is going on here, there really are

3    two conspiracies here.  One is just a run-of-the-mill — I know

4    Judge Weinfeld hated that phrase — but run-of-the-mill

5    narcotics case.  And that's what this is.  This is a

6    run-of-the-mill.  This man has nothing to do with, quote,

7    state-sponsored narcotic trafficking.

8            When he came here, the sad part of it is, or the

9    ironic part of it is, is that he figures, he and his uncle

10   figure, that they're going to be accountable, they're going to

11   come up here, they're going to plead guilty to an indictment,

12   little did they know they were going to walk into a huge

13   indictment, which got play all the time.  So if they had any

14   idea that they were going to come here under the radar, they

15   were in for a big surprise, and they were in a big surprise.

16           So, I'm looking at the roster of people that he was

17   with in which he was less culpable.  And I say that in the 3553

18   sense, not in a guideline sense.  Victor Hugo Diaz Morales was

19   the most important major narcotics trafficker in Western

20   Honduras.  He is the named person on this indictment.  Juan

21   Antonio Hernandez Alvarado, a/k/a Tony, I don't have to tell

22   you about him because you know him very well, your Honor,

23   having presided at the trial.

24           Mario Jose Hernandez, a former mayor and

25   narcotrafficker, who imported, quote, massive quantities of

1    cocaine into the United States and engaged in large-scale

2    shipping with traffickers in Colombia, Honduras, Guatemala, and

3    Mexico.

4           Mauricio Pineda, a former high-ranking member of the

5    Honduran National Police.

6           Geovanny Fuentes Ramirez — I've got to be frank with

7    you, your Honor, when I read the sentencing minutes on this

8    particular defendant, I was rooting for the good guys, and I

9    mean the good guys.  It was unbelievable, as my cocounsel, my

10   colleague, said, what this man did and what this man was

11   capable of, and he is a codefendant with this man.

12          Then there's Juan Orlando Hernandez, which I guess

13   this Court will be seeing soon, who was the head of the -- the

14   ex-President of Honduras.  There's Juan Carlos Bonilla, chief

15   of the Honduran police.  There is Rivera Maradiaga, who, with

16   my client, had a hand in murdering 125 people.  And the

17   tortures, you know, it's just another aspect --

18          THE COURT:  What did you just say?

19          MR. ZAPP:  Excuse me?

20          THE COURT:  You might want to talk to Mr. Feitel for a

21   second.

22          MR. FEITEL:  Thank you, your Honor.  I think my

23   cocounsel misspoke.

24          THE COURT:  I think he might have.

25          (Counsel confer)

N6RKMORS

1          MR. ZAPP:  I'm so sorry.  I meant Los Cachiros with

2     Ardon, Alex Ardon.  I'm very sorry.  Thank you for pointing it

3     out.

4          THE COURT:  I understood you had misspoke.

5          MR. ZAPP:  Yes.

6          And so other than Rivera Maradiaga, I was going to end

7     this by speaking about Ardon Soriano, who is my client's boss,

8     if you will.  Certainly, I think "boss" is probably a misnomer

9     because it looks like a card-carrying member of the conspiracy,

10    and, basically, he performed a specific service.  No one is

11    suggesting that he made decisions or negotiated prices or acted

12    in any authoritarian capacity.

13          Then you have the limited -- I mean the related

14    indictments, the Rosenthals, who laundered $15,000, and the top

15    money launderer there got 36 months after cooperating.

16          So I think what I'm trying to tell the Court is that

17    this is the perfect definition from the powers that be, from

18    the people who specialize in these sentencings, that my client

19    deserves a minor-role consideration with a small M.  It's hard

20    to try to keep track of it because they both are relevant in

21    both contexts.

22          So I want the Court to be aware of that, that

23    ten years in this particular case, which could be defined as a

24    person who is really less culpable, he just fits the bill.

25          THE COURT:  Thank you, Mr. Zapp.

1          Ronald Enrique Salguero-Portillo, this is your

2     opportunity to speak, to address the Court directly.  If

3     there's anything you wish to say, this is the time to say it.

4          And, Mr. Zapp, could you just move the microphone a

5     little bit closer to your client.

6          MR. ZAPP:  Oh, sure.  Yes, your Honor.

7          THE COURT:  You may remain seated, sir.

8          DEFENDANT SALGUERO-PORTILLO:  Your Honor, I would like

9     you to know who I am before you sentence me.  I'm an ordinary

10    person that lived a normal life.  I'm in the ranching business.

11    My life consisted of waking up before dawn, going to milk my

12    cows with my group, selling milk to a lady who would use them

13    to make cheeses, and then spending the major part of each day

14    supervising my ranch, maintaining and repairing its structures,

15    while I sought to protect my cattle.

16          I used to have lunch with my workers, and then I would

17    return home for lunch.  I would eat with my family, my wife and

18    three children.  I would watch television for a little while,

19    and then I would go to bed for the night.  And I would do the

20    same thing the next day and every day after that.

21          Whatever deliveries of drugs that were made that were

22    done for Alex Ardon, even those that happened twice in one

23    month, don't take into account the many months in which there

24    was nothing to transport.  Even if there were six months of

25    double deliveries, that would only cover about 12 days or no

1    more than two weeks in one year.  Those don't take into account

2    the other 50 weeks in which I was a rancher, a cowboy, and --

3            THE INTERPRETER:  Pardon, your Honor, the interpreter

4    is clarifying a term.

5            (Pause)

6            DEFENDANT SALGUERO-PORTILLO:  It doesn't take into

7    account my life as a rancher, a cowboy, or a mountain person.

8            I don't have a criminal record.  I never leave my home

9    for the night.  I never drink too much, and I don't use drugs.

10           I lived a very simple, very regimented life, the same

11   as other ranchers like me.

12           I'd like your Honor to know that I recognize and admit

13   my bad behavior.  I'm ashamed of what I did.  I'm painfully

14   aware of the dishonor and disrespect that I have brought upon

15   my family, which is devastating in a small town like mine.

16           I'd like your Honor to know that I accept full

17   responsibility for my actions without any excuses, especially

18   because I didn't have to do any of this to survive.  I live

19   with that reality every day of my life.  It's a weight that I

20   carry.

21           I have an 89-year-old mother with whom I would like to

22   spend a little more time.  So I'd like the U.S. Attorneys to

23   know that I'm -- I'm ready to help in any way I can in the

24   future.

25           Thank you.

N6RKMORS

1              THE COURT:  Thank you, sir.

2              This is the government's opportunity to speak.

3              MR. WIRSHBA:  Yes, your Honor.

4              It's the government's position that these defendants

5      had a limited role, yes, but a vital one.  And in no sense of

6      the term were these defendants' roles, in the government's

7      view, minor, whether it was with a capital or with a lower case

8      letter.

9              It's the government's view that these defendants had

10     an essential role in this conspiracy, in that they owned the

11     property that was a vital transport between Honduras and

12     Mexico.

13             It is the case, as defense counsel have said, that

14     this may not have required any specialized knowledge, but that

15     is not a mitigating factor.  The defendants were in a

16     specialized position.  They held this property that was an

17     important transit point, and they used that property to

18     transport thousands of kilos of cocaine.

19             This opportunity was not available to anyone.  And

20     while it may be the case that someone else could have done

21     this, could have been in this role, the bottom line is that

22     they were the ones who owned the property.

23             This is an aggravating factor.  As one of the

24     defendants just said, this was not something that the

25     defendants needed to do, they had other jobs, they were making

N6RKMORS

1    a living.  They chose to do this out of greed, and to use their

2    property to facilitate thousands of kilos of cocaine up to

3    Mexico and eventually to the United States.

4            Now, to Mr. Feitel's point about the fact that they

5    did not control exactly how much cocaine was coming in at any

6    individual time, whether it was five kilos or more, the bottom

7    line, your Honor, is that it was more, much more.  And what

8    that shows, that there was a willingness to allow thousands of

9    kilos of cocaine to sit on these ranches, means that it was a

10   matter of trust between the other members of the conspiracy and

11   these defendants, to keep that cocaine safe.

12           The defense has tried to characterize these defendants

13   as, in one case, an employee of Alex Ardon.  That does not

14   comport with the facts.  These defendants were partners with

15   Alex Ardon, they were coconspirators with Alex Ardon, and they

16   had an independent relationship with Alex Ardon and the

17   Mexicans who came down to pick up drugs from their land.  These

18   were not workers.  These were not people who just took orders

19   from others.  These were people who, for at least a period for

20   all this cocaine, were in exclusive control of it and were

21   responsible for protecting it from others who might try to

22   seize it and from the government.  And other members of the

23   conspiracy, the Mexican cartels who would come and pick up that

24   cocaine and the Honduran traffickers who would bring it up to

25   them, relied on these defendants for that purpose.  It was

1    important.

2          Your Honor asked about voluntary surrender, and

3    there's been a lot of discussion about that. I just want to

4    make it clear that, from the government's perspective — and I

5    think it comports with what defense counsel have said today —

6    the basis for that voluntary surrender was not a desire to

7    settle this case quickly or to accept responsibility, it was

8    fear, fear of what would happen to them if they remained in

9    Guatemala, that required them to get out of that country before

10   arrest.

11         Now, last, your Honor, I'll move on to just relative

12   culpability, because I think that's also been a feature of both

13   presentations by the defendants today.

14         It's the government's position that the guidelines do

15   account for that relative culpability, and that's why the

16   government seeks a guideline sentence in this case for both

17   defendants. This was thousands of kilograms of cocaine, much

18   like many of the other defendants who have come before this

19   Court in this same indictment and set of superseding

20   indictments, but those other defendants, their guidelines were

21   higher — their guidelines were, in many cases, life — and the

22   Court sentenced at least two of them in accordance with those

23   guidelines. The guidelines here are less. They are 210 to

24   262 months, and it's the government's view that a guidelines

25   range in this case would be appropriate for both defendants.

1              Thank you.

2              THE COURT:  Thank you, Mr. Wirshba.

3              This is the Court's statement of reasons for the

4    sentence to be imposed on Otto Rene Salguero-Morales and Ronald

5    Enrique Salguero-Portillo.

6              In sentencing the defendants, I've considered each of

7    the materials that I referenced at the outset, all the written

8    materials that I referenced; I've considered the thoughtful

9    statements of Mr. Feitel, Mr. Zapp, and Mr. Wirshba; I've

10   considered the sincere statements of Otto Salguero and of

11   Ronald Salguero; I've considered each of the factors under

12   Section 3553(a).  I need not recount all that I've considered,

13   but I have considered them.  I'll comment on some.

14             The defendants have entered pleas of guilty to

15   participating in a conspiracy to manufacture, distribute, and

16   possess with intent to distribute five kilograms and more of

17   cocaine knowing that it would be imported into the United

18   States and into waters within a distance of 12 miles of the

19   coast of the United States, and brought it aboard an aircraft

20   registered in the United States.  And this conspiracy lasted

21   from 2004 through 2019.

22             They each also pled guilty to, during and in relation

23   to the narcotics conspiracy, possessing firearms and aiding and

24   abetting the use, carrying, and possession of firearms,

25   specifically machine guns that were capable of automatically

1       shooting more than one shot.

2              In the presentence report, to which neither defendant

3       has objected, they're described as large-scale drug traffickers

4       who facilitated the transportation of thousands of kilograms of

5       cocaine moving through Central America on their way to the

6       United States.  And to aid this effort, they used, aided and

7       abetted the use of, and conspired to use firearms to protect

8       the narcotics trafficking activities.

9              They had a ranch or a finca located on the

10      Honduran-Guatemala border — they controlled it at least — and

11      it was used as a transshipment point between Honduran drug

12      traffickers who received the cocaine from Colombia and

13      Venezuela and the Mexican traffickers responsible for bringing

14      the cocaine into the United States.  And on occasions in 2003

15      and 2005, they facilitated the transportation of hundreds of

16      kilograms from Los Amates to the Mexican-Guatemala border by

17      helicopter.  And from 2010 to 2012 alone, each trip involved --

18      and these were bimonthly or monthly trips that Ardon made to

19      deliver cocaine to the defendants for the ultimate benefit of

20      the Mexican traffickers and the Sinaloa Cartel.  And during

21      that 2010-2012 period alone, each trip involved the transport

22      of hundreds to over a thousand kilograms of cocaine.  The

23      cocaine loads were transported in cattle trucks and dump

24      trucks, each capable of transporting approximately

25      750 kilograms per truck.

1           On one occasion, Ardon transported 280 kilograms of

2     cocaine, which arrived in Honduras by helicopter.  And on this

3     occasion, they provided security with automatic machine guns

4     and bazooka, and Ardon took the cocaine with the armed workers

5     to the transport facility operated by the two defendants here,

6     and they took possession of the cocaine load.

7           They agreed that they're responsible for more than

8     450 kilograms of cocaine.

9           I recognize that they were ranchers, or farmers, who

10    were lured into this by the prospects of easy money.  They did

11    play an essential role, a critical role, in the drug transport

12    chain.  Not every human being would be in a position to hold

13    this role or conduct this operation, because it required access

14    to a ranch or farm on the Guatemala-Honduras border.

15          I've also considered the fact that these defendants

16    voluntarily surrendered.  I recognize that there may have been

17    mixed motivation, and I don't, for a second, think that one of

18    the motivations were that they wanted to purge themselves of

19    their wrongdoing, but I recognize that they did surrender, they

20    negotiated their surrender, and they faced the music, so to

21    speak, unknowing exactly what the ultimate consequences would

22    be, as they still don't know because I haven't passed sentence.

23    But that is something that I take account of, as well as what

24    has been described, ever so briefly in the record here, as

25    meeting with the government, but not being signed up as a

cooperator.  There's no suggestion that they provided

inaccurate information, but, rather, it was found not necessary

in view of the fact that Mr. Ardon had been signed up as a

cooperator.

So, for me, this is an especially difficult sentencing

decision.  One of the things that I didn't hear from the

defendants that weighs on my mind is the misery, the disease,

the broken families that result from this cocaine entering the

U.S. shores, the children who will not go home to a father

because the father was done in by drug-related violence or

drug-related criminal behavior, not just drug trafficking, but

thefts to support drug use, and disease and addiction.  So

people are either killed on the street, wind up in jail, wind

up saddled with addiction or other disease, and that's the

price paid by reason of this criminal behavior.

Is it too much to ask that someone on a finca in

Guatemala think of this?  I don't think so.  Yet, I understand

how somebody could view this as something of an abstraction to

them, lured by the money.  And it was acknowledged that they

had a pretty good life, all considered, without the drug

trafficking.

So there's no injustice here.  I take account of the

fact that they're not charged with specific acts of violence

themselves.  And, again, I've noted that they came here

voluntarily.  And it's a matter of speculation whether or not

1    the U.S. would have been successful in extraditing them and

2    whether they would have successfully -- even if they sought to,

3    whether they would have secured their attendance or whether

4    they would have met with a different fate, which would have

5    deprived the government of the ability to prosecute a case

6    against them.  All that is speculation at this point.

7            But considering the sentencing guidelines, policy

8    statements, and official commentary of the United States

9    Sentencing Commission, considering it in an advisory manner,

10   and recognizing that I am not obligated to sentence within the

11   sentencing guidelines, and also recognizing there is a need to

12   avoid unwarranted sentence disparities among defendants

13   convicted of the same type of offense, I conclude that a

14   sentence of 144 months' imprisonment, five years' supervised

15   release, waiver of the fine based on limited assets, limited

16   earning ability -- is forfeiture sought?

17           MR. WIRSHBA:  No, your Honor.

18           THE COURT:  All right.

19           -- and the imposition of a special assessment of $200

20   is sufficient, but not greater than necessary, to achieve the

21   purposes of Section 3553(a).

22           Does the defendant or his counsel have any objection

23   to the Court's proposed sentence or to the statement of reasons

24   for that sentence?

25           First, Otto Salguero?

N6RKMORS

1           MR. FEITEL:  No, your Honor.

2           THE COURT:  Ronald Salguero?

3           MR. ZAPP:  No, your Honor.

4           THE COURT:  The government?

5           MR. WIRSHBA:  No, your Honor.

6           THE COURT:  All right.  The defendants will please

7      stand, and I will impose sentence.

8           Otto Rene Salguero-Morales, Ronald Enrique

9      Salguero-Portillo, it is the judgment of this Court that you

10     are sentenced to 144 months on Count One and 144 months on

11     Count Three, each term to run concurrently.

12          Further, upon release from imprisonment, you shall be

13     placed on supervised release for a period of five years, with

14     the following terms and conditions:

15          You must not commit another federal, state, or local

16     crime, nor unlawfully possess a controlled substance;

17          You must refrain from any unlawful use of a controlled

18     substance and must submit to drug testing when requested,

19     except that the above drug testing condition is suspended based

20     on the Court's determination that you pose a low risk of future

21     substance abuse.

22          You shall comply with the standard conditions of

23     supervision that appear on pages 24 and 25 of Otto's report and

24     pages 28 and 29 of Ronald's report, with the following special

25     conditions:

1          You must obey the immigration laws and comply with the

2    directives of immigration authorities;

3          You shall submit your person and any property,

4    residence, vehicle, papers, computer, or other electronic

5    communication, data storage devices, cloud storage or media and

6    effects to a search by any U.S. probation officer and, if

7    needed, with the assistance of any law enforcement.  The search

8    is to be conducted when there is reasonable suspicion

9    concerning violation of a condition of supervision or unlawful

10   conduct by the person being supervised.  Failure to submit to a

11   search may be grounds for revocation.

12         You shall warn any other occupants that the premises

13   may be subject to search pursuant to this condition.  Any

14   search shall be conducted at a reasonable time and in a

15   reasonable manner.

16         You may be supervised in the district of your

17   residence.

18         It is further ordered that you must pay to the United

19   States a special assessment of $200, which shall be due

20   immediately.

21         For the reasons indicated, the fine is waived.

22         You have the right to appeal the sentence I have

23   imposed upon you.  If you cannot afford the cost of an appeal,

24   you may apply for leave to appeal as a poor person.  The time

25   limits for file a notice of appeal are brief, and they are

N6RKMORS

1    strictly enforced.  If you request, the Clerk of Court will

2    prepare and file a notice of appeal on your behalf immediately.

3         Do you understand, Otto Salguero?

4         DEFENDANT SALGUERO-MORALES:  Yes, your Honor.

5         THE COURT:  Do you understand, Ronald Salguero?

6         DEFENDANT SALGUERO-PORTILLO:  Yes, your Honor.

7         THE COURT:  All right.

8         I will recommend to the Bureau of Prisons that each

9    defendant be housed as close to New York City as is feasible,

10   to facilitate family visitation.

11        MR. ZAPP:  Your Honor, could I be heard?

12        THE COURT:  Yes.

13        MR. ZAPP:  If it's at all possible, and I think it is,

14   but I just would like the Court to note that the two would like

15   to be together in the same facility, and it's especially

16   important because they hardly ever get to see their family.  My

17   client hasn't seen his family in years.  So I don't think that

18   it could hurt, let's put it that way.

19        THE COURT:  Well, I appreciate what you say, and as a

20   sentencing judge, I certainly have no objection to that, and

21   this record will reflect that.  That is a matter that I invite

22   you, as counsel, to take up with the Bureau of Prisons, and you

23   can indicate the sentencing judge did not indicate any

24   objection.

25        MR. ZAPP:  Okay.  Thank you very much, your Honor.

N6RKMORS

```
 1              THE COURT:  All right.

 2              Anything further from the government, underlying

 3   indictment?

 4              MR. WIRSHBA:  Yes, your Honor.  The government would

 5   seek to dismiss the underlying counts.

 6              THE COURT:  All right.

 7              Without objection, that is granted.

 8              Anything further from the government?

 9              MR. WIRSHBA:  Nothing from the government, your Honor.

10              THE COURT:  From the defendants?

11              MR. FEITEL:  No, your Honor.  Thank you very much.

12              MR. ZAPP:  No, your Honor.

13              THE COURT:  All right.

14              Otto Salguero, Ronald Salguero, I wish you both long

15   and healthy lives.  I hope the time goes by uneventfully for

16   you, that you figure out how to make it up to people who have

17   suffered as a result of your crimes.  And, again, I wish you a

18   healthy return to Guatemala when your sentence is completed.

19              We are adjourned.  Thank you.

20              COUNSEL:  Thank you, your Honor.

21              (Adjourned)

22

23

24

25
```